## MODERN CIGARETTE, INC. *v.* TOWN OF ORANGE ET AL.
### (SC 16259)

McDonald, C. J., and Borden, Norcott, Katz, Palmer, Sullivan and Vertefeuille, Js.*

* The listing of justices reflects their seniority status on this court as of the date of argument.

Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion was officially released, his continued participation on this panel is authorized by General Statutes § 51-198 (c).

Argued September 27, 2000—officially released May 8, 2001

*Richard Blumenthal*, attorney general, with whom were *Eliot D. Prescott*, assistant attorney general, and *Brian M. Stone*, for the appellants (defendants and intervening defendant).

*Anthony S. Bonadies*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The sole issue in this appeal is whether an ordinance adopted by the named defendant, the town of Orange (town), banning all cigarette vending machines within its borders (ordinance) is preempted by General

Statutes § 12-289a.[1] The trial court concluded that state law preempted the ordinance. Accordingly, the trial court declared the ordinance invalid and enjoined the town from enforcing it. Because we determine that § 12-289a does not prohibit the town, acting within its pow-

---

[1] General Statutes § 12-289a provides: "Vending machines: Placement restrictions. Penalties. (a) No cigarette vending machine or restricted cigarette vending machine may be placed in an area, facility or business which is frequented primarily by minors. No cigarettes may be dispensed from any machine other than a cigarette vending machine or a restricted cigarette vending machine.

"(b) A cigarette vending machine may be placed only in (1) an area, facility or business which is accessible only to adults or (2) an area, facility or business permitted under chapter 545 if the area, facility or business has a separate area accessible only to adults and the machine is placed in such area.

"(c) A cigarette vending machine, until July 1, 1998, may be placed in an area, facility or business permitted under chapter 545 which does not have a separate area accessible only to adults provided the machine is not placed in a vestibule, lobby, entryway, exit or restroom and the machine is under the direct supervision, and in the direct line of sight of, an adult employee of the permittee.

"(d) A cigarette vending machine, until May 1, 1997, may be placed in an area, facility or business not provided for under subsections (b) and (c) of this section provided the machine is not placed in a vestibule, lobby, entryway, exit or restroom and the machine is under the direct supervision, and in the direct line of sight of, an adult employee.

"(e) After May 1, 1997, no cigarette vending machine may be placed in any area, facility or business other than as provided in subsections (b) and (c) of this section.

"(f) After July 1, 1998, no cigarette vending machine may be placed in any area, facility or business other than as provided in subsection (b) of this section.

"(g) The Commissioner of Revenue Services shall assess any person, dealer or distributor who violates the provisions of this section a civil penalty of two hundred fifty dollars for a first violation and five hundred dollars for a second violation within eighteen months. For a third violation within eighteen months, such penalty shall be five hundred dollars and any such machine shall be immediately removed from such area, facility or business and no such machine may be placed in such area, facility or business for a period of one year following such removal.

"(h) Nothing in this section shall be construed as limiting a town or municipality from imposing more restrictive conditions on the use of vending machines for the sale of cigarettes. A municipality shall be responsible for the enforcement of such conditions."

ers to protect the health, safety and welfare of its citizens, from banning all cigarette vending machines within its borders, we reverse the judgment of the trial court.

The record discloses the following facts as stipulated to by the parties, and as found by the trial court. On May 13, 1998, the town adopted the ordinance prohibiting cigarette vending machines within its borders.[2] In par-

---

[2] The town's notice of the enactment of the ordinance provides:

"In accordance with Section 3.4 of the charter of the Town of Orange, notice is hereby given to the legal voters and those persons qualified to vote in Town Meetings of the Town of Orange that on May 13, 1998 the Orange Board of Selectmen enacted the ordinance set forth below:

"ORDINANCE REGULATING THE ADVERTISING OF TOBACCO
RELATED PRODUCTS AND PROHIBITING CIGARETTE
VENDING MACHINES IN THE TOWN OF ORANGE

"WHEREAS: Sections 53-344 and 53-244a of the Connecticut General Statutes make it unlawful for any person engaged in the manufacture or sale of cigarettes to sell, barter, or give cigarettes to any individual under the age of 18 years; and

"WHEREAS: Cigarettes are the most heavily advertised product in the United States and the tobacco industry spends more than $421 million annually for outdoor advertising of cigarettes; and

"WHEREAS: More than 3 million young people under the age of 18 consume more than 947 million packs of cigarettes annually in the United States, yielding gross sales to the tobacco industry each year of approximately $1 billion; and

"WHEREAS: Recent governmental survey[s] have found a 50% increase in the percentage of adolescents who smoke cigarettes; and

"WHEREAS: The United States Supreme Court has repeatedly recognized that children deserve special solicitude because they lack the ability to assess and fully analyze the information presented to them through the commercial media; and

"WHEREAS: Outdoor advertisements are a unique and distinguishable medium of advertising which subjects the general public to involuntary and unavoidable forms of solicitation, as the Supreme Court recognized in *Packer Corporation* v. *Utah*, 285 U.S. 105 (1932) by citing with approval the following excerpt fro[m] the opinion of the Utah Supreme Court: *'Advertisements of this sort are constantly before the eyes of observers on the streets . . . to be seen without the exercise of choice or volition [on] their part. Other forms of advertising are ordinarily seen as a matter of choice on the part of the observer. The young people as well as adults have the message of the billboard thrust upon them by all the arts and devices that skill can produce. In the case of newspapers and magazines, there must be some seeking by*

ticular, the ordinance provides that "[n]o person shall

*the one who is to see and read the advertisement. The radio can be turned off, but not so the billboard. . . . These distinctions clearly place this kind of advertisement in a position to be classified so that regulations or prohibitions may be imposed upon all within the class. This is impossible with respect to newspapers and magazines,'* and

"WHEREAS: The United States Supreme Court and other courts have recognized the positive relationship between advertising and consumption as regards a variety of goods and services, such as gambling, cigarettes (*Capital Broadcasting Company* v. *Mitchell,* 33 F. Supp. 582 [DDC, 1971]) and alcohol (*Dunagin* v. *City of Oxford,* 718 F. 2d 738, 747–51 [1983]); and

"WHEREAS: In addition to judicial recognition of the general link between advertising and consumption, there is specific and convincing evidence that tobacco advertising plays a significant role in stimulating illegal consumption of cigarettes by minors, including:

"The Surgeon General has concluded that tobacco advertising and promotion do appear to stimulate cigarette consumption ('Reducing the Health Consequences of Smoking: 25 Years of Progress, A Report of the Surgeon General.') Department of Health and Human Services, 1989.

"About 85% of adolescent smokers prefer the three most heavily advertised cigarette brands. 'Comparison of Cigarette Brand Preference of Adult and Teenage Smokers,' Morbidity and Mortality Weekly Report, Centers for Disease Control, 1992.

"After [the] Joe Camel campaign was introduced, Camel's market share among underage smokers jumped from 0.5% to 32.8% in three years. 'RJR Nabisco's Cartoon Camel Promotes Camel Cigarettes [to] Children,' Journal of the American Medical Association, December 11, 1991.

"Tobacco advertising emphasizes themes (sexual attraction, social acceptance, thinness, and independence) which appeal to youth. 'Current trends in Cigarette Advertising and Marketing,' New England Journal of Medicine, December 11, 1991.

"Six-year olds are familiar enough with cigarette advertising that they match the 'Old Joe Camel' character with cigarettes as often as they pair Mickey Mouse with the Disney Channel. 'Brand Logo Recognition by Children Aged 3 to 6 Years,' Journal of the American Medical Association, December 11, 1991.

"When asked what cigarette brand was most frequently advertised, only 13.7% of adults named Camel, compared to 28.5% of adolescents (12 to 17 years old). Recognition of the Joe Camel campaign was highest among 12 and 13 year old[s]. 'Does Tobacco Advertising Target Young People to Start Smoking?', Journal of the American Medical Association, December 11, 1991.

"Cigarette advertising expenditures for promotional items such as hats, T-shirts and toy chains quadrupled, from $184 million to $576 million, between 1991 and 1993. These items bear no health warnings and are easily obtained by children. Federal Trade Commission, '1995 Federal Trade Commission Report to Congress for 1993,' 1995.

dispense or cause to be dispense[d] cigarettes, tobacco

"Thirty percent of children (12 to 17 years old), both smokers and non-smokers, own at least one tobacco promotional item. 'Teenage Attitudes and Behaviors Concerning Tobacco' Gallop International Institute, September 1992.

"While overall cigarette advertising in magazine[s] has declined sharply, the number of ads per issue in magazines with substantial youth readership has remained constant. 'Minority Issues,' Tobacco Use: An American Crisis, Washington, DC, American Medical Association, 1993.

"According to a recent survey, adults overwhelmingly support measures which would prohibit tobacco advertising which appeals to children. Seventy-one percent favor extending regulation to nicotine products, such as patches and gum, to cigarettes; 73% believe tobacco ads without pictures and cartoons would make smoking less appealing to kids; 74% think cigarette pack coupons for promotional items which appeal to youth should be eliminated. 'Youth Access to Tobacco,' Robert Wood Johnson Foundation, February 1995; and

"WHEREAS: There has been an alarming rise between 1991 and 1996 in the Northeast of teenagers who have reported to have smoked tobacco products within the preceding month to wit: 61.3% rise in eighth graders, 37% rise among tenth graders, and 26% rise among twelfth graders. The Monitoring the Future Study, University of Michigan, 1996; and

"WHEREAS: Local school officials have reported a noticeable rise in teenage smoking; and

"WHEREAS: Current laws and regulations have proved ineffective and inadequate in preventing the illegal purchase of cigarettes by children under the age of 18 years, particularly from cigarette vending machines; and

"WHEREAS: An ordinance restricting the placement of advertisements for cigarette and tobacco products in publicly visible locations and prohibiting the dispensing of cigarettes, tobacco and smokeless tobacco from vending machines with the Town of Orange is necessary for the promotion of the welfare and temperance of minors exposed to such advertisements; and

"WHEREAS: The restrictions contained in the following ordinance will not unduly burden legitimate business activities of persons licensed by the State of Connecticut to sell cigarettes and tobacco products or persons licensed by the State of Connecticut to sell alcoholic beverages on a retail basis.

"NOW, THEREFORE, BE IT ORDAINED by the Board of Selectmen of the Town of Orange to hereby adopt the following ordinance:

"Section 1: Tobacco Outdoor Advertisements

"(a) No person may place any sign, poster, placard, device, graphic display, or any other form of advertising that advertises cigarettes, tobacco, or smokeless tobacco in publicly visible locations. 'Publicly visible location' means any (i) outdoor location visible to the public including, but not limited to, outdoor billboards, roofs and sides of building, water towers and free-standing signboards; and (ii) doors or windows reasonably visible to the

# or smokeless tobacco products from vending machines

public from the outside at a distance of two feet from such doors or windows; and (iii) 'Publicly visible location' does not mean or include any location intended to be visible only by those inside a premises, a private residence or a multiple dwelling unit.

"(b) This section does not apply to:

"(1) The placement of signs, including advertisements, inside business premises that sell cigarettes, tobacco or smokeless tobacco where such signs are not visible from a public or private street;

"(2) The placement of signs, including advertisements, on commercial vehicles used for transporting cigarettes, tobacco, or smokeless tobacco;

"(3) Any sign that contains the name or slogan of the business premises referred to in subparagraph 1 of this subsection b that has been placed for the purpose of identifying such premises, provided it is not a cigarette, tobacco or smokeless tobacco product 'brand name.'

"(4) Any signs not located within 1,000 feet of any zone permitting residences under the Orange Zoning Regulation, or not located within 1,000 feet of any place of worship, school, recreational facility, playground, park, movie theatre or other entertainment facility not restricted to persons over eighteen years of age.

"(c) No person shall dispense or cause to be dispense[d] cigarettes, tobacco or smokeless tobacco products from vending machines at any location within the Town of Orange.

"(d) This section shall not be construed to permit any display that is otherwise restricted or prohibited by law.

"Section 2: Public Service Advertising

"This ordinance shall not be construed to prohibit the display of public service messages designed to communicate the hazards of cigarettes, tobacco products or smokeless tobacco or to encourage minors to refrain from consuming or purchasing tobacco products. However, this section shall not be construed to permit such a message when it is made in conjunction with the positive display of a recognized image, artwork, photograph, logo or graphic used for marketing or promotion of cigarettes, tobacco products or smokeless tobacco.

"Section 3: Permits

"(a) No persons shall place any advertising display within the areas affected by the provisions of this ordinance without first having secured a written permit from the Sign Administrator. The Board of Selectmen designates the Zoning Enforcement Officer of the Town of Orange as its Sign Administrator.

"(b) Every person desiring a permit to place any advertising display shall file an application with the Board of Selectmen of the Town of Orange.

"(c) The application shall be filed on a form to be furnished by the Sign Administrator or by his agent. It shall set forth the name and address of the applicant and shall contain a general description of the property upon which it is proposed to place the advertising display for which a permit is

at any location within the Town . . . ." The ordinance

sought and a diagram indicating the location of the proposed advertising display on the property, in such a manner that the property and the location of the proposed advertising display may be readily ascertained and identified.

"(d) The applicant for any permit shall offer evidence that the owner or other person in control or possession of the property upon which the location is situated has consented to the placing of the advertising display.

"(e) An application for a permit to place a display shall contain a description of the display, including its material, size and subject and the proposed manner of placing it.

"(f) If the applicant for a permit is engaged in the outdoor advertising business, the application shall contain the number of the state license.

"(g) If the application is in full compliance with the state and local laws, the Sign Administrator or his authorized agent shall, within 10 days after compliance and upon payment by the applicant of a $500.00 fee, issue a permit to place the advertising display for the remainder of the calendar year in which the permit is issued.

"(h) Permits shall be renewed on the first day of January of each year upon the application and the payment of fees as provided in this chapter and shall expire on the 31st day of December of that year.

"(i) Each permit provided in this section shall carry an identification number and shall entitle the holder to place the advertising display described in the application.

"(j) Identification number plates shall be furnished by the Sign Administrator; each shall bear the identification number of the advertising display to which it is assigned.

"(k) No person shall place any advertising display unless there is securely fastened upon the front thereof an identification number place of the character specified in Section 3 (j). The placing of any advertising display without having affixed thereto a valid identification number plate is prima facie evidence that the advertising display has been placed and is being maintained in violation of the provisions of this ordinance and shall be deemed a public nuisance subject to abatement in accordance with applicable law.

"Section 4: Sign Administration

"(a) The Board of Selectmen shall appoint a Sign Administrator who is directed to administer and enforce the terms and conditions of this chapter and all other [provisions'] flaws relating to signs. The Sign Administrator is empowered to delegate the duties and powers granted by this section to other persons under his/her direct supervision. The Sign Administrator and such other person(s) shall constitute the Sign Administration Section of the Board of Selectmen. Until changed by vote of the Board of Selectmen, the Zoning Enforcement Officer shall serve as the Sign Administrator.

"(b) The duties of the Sign Administrator shall include not only the issuance of permits as required by this chapter, but also the responsibility of ensuring that all signs comply with this chapter and any other applicable law and that all signs for which a permit is required do, in fact, have a

contains a number of factual determinations that were reported, essentially, as legislative findings. Specifically, the ordinance reported that local school officials had noticed a significant rise in teenage smoking, and further recounted that "[c]urrent laws and regulations have proved ineffective and inadequate in preventing

permit. The Sign Administrator shall make such inspections as may be necessary and initiate appropriate action to bring about compliance with this chapter and other applicable law if such inspection discloses any instance of noncompliance. The Sign Administrator shall investigate thoroughly any complaints of alleged violations of this chapter.

"Section 5: Violations, Penalties, Civil Actions

"(a) Any person or business entity who violates any provision of this ordinance shall be guilty of an infraction and, upon conviction in any court of competent jurisdiction, shall be subject to administrative assessment of civil penalties.

"(b) Causing, permitting, aiding, abetting or concealing a violation of any provision of this ordinance shall constitute a violation of such provision.

"(c) Each day of violation is a separate infraction.

"(d) Penalties for violations shall be $100 for each offense, with an additional $100 per day for each day that the violation continues.

"(e) In addition to the other remedies provided in this Section, any violation of this ordinance may be enforced by a civil action brought by the Board of Selectmen. In such action, the Board of Selectmen may seek, and the Court shall grant, as appropriate, any or all of the following remedies:

"(1) A temporary and/or permanent injunction;

"(2) Assessment of the violator for costs of any investigation, inspection, or monitoring survey that led to the establishment of the violation, including but not limited to reasonable costs of preparing the bringing legal action under this subsection, and attorney compensation;

"(3) Costs incurred in removing, correcting, or terminating the adverse effects resulting from the violation;

"(4) A finding, after two or more violations of this ordinance involving the same outdoor sign, that the outdoor sign constitutes a public nuisance.

"(f) Other remedies, if any, as set forth in the Town of Orange Zoning Regulation shall also apply to this ordinance.

"Section 6: Effective Date

"(a) The effective date of this ordinance shall be on the date of its enactment provided the provisions of this ordinance shall not, except with respect to renewals of any contract occurring after the effective date, be interpreted or applied in a manner which will impair or affect any right or obligations under any contract in existence as of the effective date of this ordinance.

"Notice of Enactment of Ordinance dated at Orange, CT this 18th day of May, 1998. . . ." (Emphasis in original.)

the illegal purchase of cigarettes by children under the age of [eighteen] years, particularly from cigarette vending machines . . . ."

Prior to the adoption of the ordinance, the plaintiff, Modern Cigarette, Inc., a duly licensed distributor of tobacco products as defined by General Statutes § 12-285 (4),[3] which owns and operates approximately 100

---

[3] General Statutes § 12-285 provides: "Definitions. When used in this chapter, unless the context otherwise requires, 'person' means any individual, firm, fiduciary, partnership, corporation, limited liability company, trust or association, however formed; 'distributor' means (1) any person in this state engaged in the business of manufacturing cigarettes; (2) any person, other than a buying pool, as defined herein, who purchases cigarettes at wholesale from manufacturers or other distributors for sale to licensed dealers, and who maintains an established place of business, including a location used exclusively for such business, which has facilities in which a substantial stock of cigarettes and related merchandise for resale can be kept at all times, and who sells at least seventy-five per cent of such cigarettes to retailers who, at no time, shall own any interest in the business of the distributor as a partner, stockholder or trustee; (3) any person operating five or more retail stores in this state for the sale of cigarettes who purchases cigarettes at wholesale for sale to dealers but sells such cigarettes exclusively to retail stores such person is operating; (4) any person operating and servicing twenty-five or more cigarette vending machines in this state who buys such cigarettes at wholesale and sells them exclusively in such vending machines. If a person qualified as a distributor in accordance with this subdivision, in addition sells cigarettes other than in vending machines, such person shall be required to be qualified as a distributor in accordance with subdivision (2) of this section and have an additional distributor's license for purposes of such other sales; (5) any person who imports into this state unstamped cigarettes, at least seventy-five per cent of which are to be sold to others for resale; (6) any person operating storage facilities for unstamped cigarettes in this state; 'cigarette vending machine' means a machine used for the purpose of automatically merchandising packaged cigarettes through the insertion of the proper amount of coins therein by the purchaser, but does not mean a restricted cigarette vending machine; 'restricted cigarette vending machine' means a machine used for the dispensing of packaged cigarettes which automatically deactivates after each individual sale, cannot be left operable after a sale and requires, prior to each individual sale, a face-to-face interaction or display of identification between an employee of the area, facility or business where such machine is located and the purchaser; 'dealer' means any person other than a distributor who is engaged in this state in the business of selling cigarettes, including any person operating and servicing fewer than twenty-five cigarette vending

cigarette vending machines statewide, had been operating one cigarette vending machine within the town. Following the adoption of the ordinance, the plaintiff removed the vending machine from service and brought this action against the town and its selectpersons, seeking, inter alia, a declaration that the town's ordinance was invalid, and an injunction prohibiting the town from enforcing it. The plaintiff claimed that the ordinance was invalid because it: (1) was preempted by state law; (2) constituted a taking without just compensation; and (3) violated the plaintiff's substantive due process rights. The plaintiff also claimed that the state's delegation of power to municipalities to ban cigarette vending machines was unconstitutionally vague. The trial court, *Pittman, J.*, granted a motion to intervene by the state.[4]

---

machines who shall be classified herein as a vending machine dealer; 'licensed dealer' means a dealer licensed under the provisions of this chapter; 'stamp' includes impressions made by metering machines authorized to be used under the provisions of section 12-299; 'sale' or 'sell' includes or applies to gifts, exchanges and barter; and 'buying pool' means and includes any combination, corporation, association, affiliation or group of retail dealers operating jointly in the purchase, sale, exchange or barter of cigarettes, the profits from which accrue directly or indirectly to such retail dealers, provided any person holding a distributor's license issued prior to June 29, 1951, shall be deemed to be a distributor within the terms of this section. For the purposes of part I and part II only of this chapter, 'cigarette' means and includes any roll for smoking made wholly or in part of tobacco irrespective of size or shape and irrespective of whether the tobacco is flavored, adulterated or mixed with any other ingredient, where such roll has a wrapper or cover made of paper or any other material, except where such wrapper is wholly or in the greater part made of tobacco and such roll weighs over three pounds per thousand, provided, if any roll for smoking has a wrapper made of homogenized tobacco or natural leaf tobacco, and the roll is a cigarette size so that it weighs three pounds or less per thousand, such roll is a cigarette and subject to the tax imposed by part I and part II of this chapter; 'unstamped cigarette' means any package of cigarettes to which the proper amount of Connecticut cigarette tax stamps or impressions have not been affixed."

[4] The town, its selectpersons and the state are hereinafter referred to collectively as the defendants.

In addition to the parties' written stipulation regarding most of the factual issues in the case,[5] the trial court found the following facts based on "certain additional and largely uncontroverted evidence."[6] The trial court determined that both the state and the town have a legitimate interest in promoting the health, safety and welfare of its citizens through the regulation of tobacco products and in preventing youth access to cigarettes. See, e.g., General Statutes §§ 53-344 and 53-344a.[7] Despite these statutes prohibiting the sale of tobacco products to minors, the trial court noted that Connecticut youth, including minors in the town, had experienced "little difficulty in making illegal purchases of tobacco products from [cigarette vending] machines."

[5] The stipulation provides background information regarding the plaintiff's business status, its licensing fee, the reporting requirements that it must satisfy in order to comply with chapter 214 of the General Statutes, and, most significantly, the ordinance and pertinent statutes.

[6] Pursuant to an agreement of the parties, the trial court heard evidence regarding only the validity of the ordinance, and deferred its consideration of the issue of damages to a later date in the event that the plaintiff prevailed.

[7] General Statutes § 53-344 provides: "Sale of tobacco to minors under eighteen. (a) Any person who sells, gives or delivers to any minor under eighteen years of age tobacco, unless the minor is delivering or accepting delivery in his capacity as an employee, in any form shall be fined not more than two hundred dollars for the first offense, not more than three hundred fifty dollars for a second offense within an eighteen-month period and not more than five hundred dollars for each subsequent offense within an eighteen-month period.

"(b) Any person under eighteen years of age who purchases or misrepresents his age to purchase tobacco in any form shall be fined not more than fifty dollars for the first offense and not less than fifty dollars nor more than one hundred dollars for each subsequent offense."

General Statutes § 53-344a provides: "Sale of tobacco. Proof of age. Each retailer of cigarettes or tobacco products or employee of such retailer shall require a person who is purchasing or attempting to purchase cigarettes or tobacco products, whose age is in question, to exhibit proper proof of age. If a person fails to provide such proof of age, such retailer or employee shall not sell cigarettes or tobacco products to the person. As used in this section, 'proper proof' means a motor vehicle operator's license, a valid passport or an identity card issued in accordance with the provisions of section 1-1h."

In reaching this conclusion, the court recognized a 1988 survey commissioned by the state department of mental health and addiction services, which, the court said, "demonstrated that minors were successful in their efforts to purchase cigarettes from a vending machine in six out of every ten attempts." Indeed, the survey indicated that "a minor is twice as likely to be able to purchase cigarettes from a vending machine as from a convenience store or other over-the-counter outlet." According to the survey, minors "have even succeeded in illegally purchasing cigarettes from restricted vending machines, which are designed to prevent the sale of tobacco to minors by requiring a face-to-face transaction with the operator of the machine." The trial court noted the fact that cigarette vending machines are essentially age-blind and, therefore, remain a significant source of tobacco products for minors, despite the existence of state laws prohibiting or limiting their placement in areas accessible to minors. Indeed, the court noted, "[t]he ordinance in question was a product of the [town's] concern, based, inter alia, on the data previously mentioned, that teenage smoking is a public health hazard and that vending machines are a prime source of cigarettes for those youths who wish to smoke them." The trial court acknowledged that the town's purpose of preventing youth access to tobacco was well served by the ordinance, which was both rationally and reasonably related to that purpose.

Despite its findings regarding youth access to cigarettes, the trial court concluded that § 12-289a (h) preempts the ordinance, and therefore, the court declared the ordinance invalid. Thereafter, the plaintiff withdrew its claims for damages, and, accordingly, the trial court rendered judgment for the plaintiff. The defendants appealed to the Appellate Court and, pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c), we transferred the appeal to this court.

I

Before we determine the merits of the plaintiff's claims, we begin with a discussion of certain controlling legal principles. First, it is undisputed that "[t]he challenged ordinance is an exercise of the police power conferred upon the town by statute. There is no doubt that the town has a right to regulate a business, pursuant to its police power, in the interest of protecting the public safety or the welfare of its inhabitants. . . . Any such regulation, however, must be reasonably calculated to achieve that purpose; it must have a rational relationship to its objective. . . . The State may regulate any business or the use of any property in the interest of the public welfare or the public convenience, provided it is done reasonably. . . . The limit of the exercise of the police power is necessarily flexible, because it has to be considered in the light of the times and the prevailing conditions. . . . Whether the times and conditions require legislative regulation, as well as the degree of that regulation, is exclusively a matter for the judgment of the legislative body . . . . Courts can interfere only in those extreme cases where the action taken is unreasonable, discriminatory or arbitrary. . . . Every intendment is to be made in favor of the validity of [an] ordinance and it is the duty of the court to sustain the ordinance unless its invalidity is established beyond a reasonable doubt. . . . [T]he court presumes validity and sustains the legislation unless it clearly violates constitutional principles. . . . If there is a reasonable ground for upholding it, courts assume that the legislative body intended to place it upon that ground and was not motivated by some improper purpose. . . . This is especially true where the apparent intent of the enactment is to serve some phase of the public welfare." (Citations omitted; internal quotation marks omitted.) *Blue Sky Bar, Inc.* v. *Stratford*, 203 Conn. 14, 22–23, 523 A.2d 467 (1987).

Second, in determining whether a local ordinance is preempted by a state statute, we must consider whether the legislature has demonstrated an intent to occupy the entire field of regulation on the matter or whether the local ordinance irreconcilably conflicts with the statute. In this case, we examine the statute to assess whether there is a conflict.

"Whether an ordinance conflicts with a statute or statutes can only be determined by reviewing the policy and purposes behind the statute and measuring the degree to which the ordinance frustrates the achievement of the state's objectives. . . . *Helicopter Associates, Inc.* v. *Stamford*, 201 Conn. 700, 705, 519 A.2d 49 (1986); *Shelton* v. *Commissioner of Environmental Protection*, 193 Conn. 506, 517, 479 A.2d 208 (1984); *Dwyer* v. *Farrell*, 193 Conn. 7, 12–14, 475 A.2d 257 (1984)." (Internal quotation marks omitted.) *Bauer* v. *Waste Management of Connecticut, Inc.*, 234 Conn. 221, 232, 662 A.2d 1179 (1995). Therefore, "[t]hat a matter is of concurrent state and local concern is no impediment to the exercise of authority by a municipality through the enactment of an ordinance, so long as there is no conflict with the state legislation. See *State* v. *Gordon*, 143 Conn. 698, 706, 125 A.2d 477 (1956); *City of Junction City* v. *Lee*, 216 Kan. 495, 498–99, 532 P.2d 1292 (1975). Where the state legislature has delegated to local government the right to deal with a particular field of regulation, the fact that a statute also regulates the same subject in less than full fashion does not, ipso facto, deprive the local government of the power to act in a more comprehensive, but not inconsistent, manner. See *Connecticut Theatrical Corporation* v. *New Britain*, 147 Conn. 546, 553, 163 A.2d 548 (1960); *State* v. *Gordon*, supra, 706; see also *Page* v. *Welfare Commissioner*, [170 Conn. 258, 266, 365 A.2d 1118 (1976)]." *Aaron* v. *Conservation Commission*, 183 Conn. 532, 543, 441 A.2d 30 (1981).

Therefore, merely because a local ordinance, enacted pursuant to the municipality's police power, provides higher standards than a statute on the same subject does not render it necessarily inconsistent with the state law. Whether a conflict exists depends on whether the ordinance permits or licenses that which the statute forbids, or prohibits that which the statute authorizes. "If, however, both the statute and the ordinance are prohibitory and the only difference is that the ordinance goes further in its prohibition than the statute, but not counter to the prohibition in the statute, and the ordinance does not attempt to authorize that which the legislature has forbidden, or forbid that which the legislature has expressly authorized, there is no conflict. . . . Where a municipal ordinance merely enlarges on the provisions of a statute by requiring more than a statute, there is no conflict unless the legislature has limited the requirements for all cases." (Citations omitted.) Id., 544.

Finally, our resolution of this case is guided by our statutory construction jurisprudence. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *Luce* v. *United Technologies Corp.*, 247 Conn. 126, 133, 717 A.2d 747 (1998). In construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended. *Kron* v. *Thelen*, 178 Conn. 189, 192, 423 A.2d 857 (1979); accord *Willow Springs Condominium*

*Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 26, 717 A.2d 77 (1998). Finally, because the question presented [in] this appeal involves an issue of statutory construction, our review is plenary. E.g., *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 318, 702 A.2d 1180 (1997)." (Internal quotation marks omitted.) *Schreck* v. *Stamford*, 250 Conn. 592, 596–97, 737 A.2d 916 (1999).

Against this background of controlling legal principles, we must determine whether the town ordinance conflicts with, or is in conformity with § 12-289a (h). In answering this question, it is important to note that this case does *not* involve the *total* prohibition of the sale of cigarettes. Indeed, the availability of tobacco products in the town, to people who are legally permitted to purchase them, remains unabated.[8] The sole purpose of this ordinance is to prevent *minors*, those persons who are *not* legally permitted to use tobacco products, from obtaining them via vending machines. The only effect of the ordinance is to eliminate *vending machines* as a source of tobacco products to minors. Indeed, as the trial court recognized, minors have been successful in using these machines, despite the legislative restrictions on their placement. As the record amply demonstrates, even when the use of cigarette vending machines requires the purchase of tokens from an adult, and even when the machines are located in areas within the line of sight of adults, minors nevertheless manage to use them to purchase tobacco products.

---

[8] The subject ordinance merely proscribes the sale of tobacco from vending machines; it does not preclude all sales of tobacco. The plaintiff, therefore, is not forbidden absolutely from selling its products. Rather, the effect of the ordinance is to eliminate one method by which the plaintiff may sell its products. Although the ordinance limits the plaintiff in the manner of merchandising its product, there is nothing in the ordinance that forbids the plaintiff from selling its products directly through adult vendors.

## II

It requires little analysis to conclude that local regulation in the area of public health was not only anticipated, but expressly authorized by the legislature. See General Statutes § 7-148 (c) (7) (H) (xi) (towns granted broad police powers to "[p]rovide for the health of the inhabitants of the municipality and do all things necessary or desirable to secure and promote the public health"). This broad statutory mandate authorizing regulations at both the state and local levels, in conjunction with specific legislative findings and declarations of policy, serves as the setting in which we evaluate the claims of the parties. "In doing so, we are mindful that the statutory scheme of this legislation envisages its adaptation to infinitely variable conditions for the effectuation of the purposes of these statutes." *Aaron* v. *Conservation Commission*, supra, 183 Conn. 541.

We begin with the specific legislation that the trial court was called upon to consider. Section 12-289a reflects, in general, the legislature's concern that tobacco products are being used by minors, and in particular, its intent to eliminate cigarette vending machines as a source of tobacco products for minors. The statute provides in relevant part: "No cigarette vending machine or restricted cigarette vending machine may be placed in an area, facility or business which is frequented primarily by minors. No cigarettes may be dispensed from any machine other than a cigarette vending machine or a restricted cigarette vending machine." General Statutes § 12-289a (a). It further provides: "A cigarette vending machine may be placed only in (1) an area, facility or business which is accessible only to adults or (2) an area, facility or business permitted under chapter 545 if the area, facility or business has a separate area accessible only to adults and the machine is placed in such area." General Statutes § 12-289a (b). Violation of these restrictions is punishable

by the imposition of fines and, upon a third violation, the removal of the machines. See General Statutes § 12-289a (g).

Examination of the legislative history confirms that the primary purpose of § 12-289a was to prevent youth access to cigarettes that otherwise had been made available by vending machines. Proponents of this statute recognized that more than 80 percent of all nicotine addicts became addicted before turning eighteen years of age, 25 percent of those smokers started at age twelve, while another 25 percent began smoking by the age of thirteen or fourteen.[9] Despite the fact that the

[9] The following excerpts are examples of the discussion in 1992 by legislators in favor of § 12-289a and its 1996 amendment that best demonstrate the legislature's intent to eliminate the sale of tobacco products to minors:

"It's not uncommon for nicotine addicts to need a fix every 20 minutes. Nicotine is such an addicting drug that once addicted it becomes a lifetime addiction. An interesting thing about nicotine, however, is that *over 80% of all of the nicotine addicts in our society become addicted before the age of 18.*

"Yet we live in a society where it is illegal to buy tobacco products before the age of 18. If we can prevent those youngsters under the age of 18 from ever smoking, we can in fact prevent, eliminate most of the use of tobacco in our society. . . .

"The fact of the matter is that in our society anyone tall enough to put quarters in the machine can buy cigarettes. If we are serious about wanting to reduce the tragic toll that results from the addiction to nicotine and the use of tobacco product in our society we have to start by controlling access by youngsters.

"Therefore, I think it is absolutely essential that we control the use of vending machines in our society. I'm not unique in that thought. Other states are examining this, other municipalities are doing this and in addition, the Surgeon General of the United States is also supportive of either the elimination of vending machines or the control so that they would only be placed in positions or locations where youngsters would not have access to them." (Emphasis added.) Conn. Joint Standing Committee Hearings, Public Health, Pt. 2, 1992 Sess., pp. 309–10, remarks of Representative Robert Farr.

Similarly, in 1996, Representative Pamela Z. Sawyer testified: "I think one of the most horrifying facts is that 25% of the smokers start at age 12. 25% started by the age of 13 or 14. And what was shown was that these children, these youngest children, had the easiest access through vending machines, which is one of the reasons that this particular area was targeted." 39 H.R. Proc., Pt. 17, 1996 Sess., p. 6055.

purchase of tobacco products by minors was illegal, this target audience had been able, nevertheless, to gain access to such products. Indeed, it was readily apparent to our lawmakers that minors were purchasing tobacco products through means that did not require adult involvement. Vending machines were at least partly responsible. As the trial court remarked: "[R]estrictions [on the use of vending machines] have been systematically increased over the years in ways that reflect the state's legitimate concern that such machines are an important source of tobacco products illegally obtained by minors." Therefore, if the government were to address the issue comprehensively, it had to control access by minors to the easiest source available—the vending machine. Section 12-289a directly addresses that concern.

The provision of the statute upon which the trial court in the present case relied to decide that the town's ordinance was preempted provides: "Nothing in this section shall be construed as limiting a town or municipality from imposing more restrictive conditions on the use of vending machines for the sale of cigarettes. A municipality shall be responsible for the enforcement of such conditions." General Statutes § 12-289a (h). According to the trial court, because § 12-289a (h) refers to the imposition of "more restrictive conditions on the use of vending machines," and does not use the word "prohibit," it did not believe that the legislature had given municipalities the power to impose an outright ban on cigarette vending machines. Accordingly, the trial court concluded that, by banning cigarette vending machines, the ordinance prohibits that which the statute authorizes, and therefore the ordinance was " 'irreconcilably inconsistent' " with state law.

The defendants argue that the trial court's reasoning was flawed in that it viewed § 12-289a (h), not as an indication that municipalities are free to impose even

greater regulatory control over cigarette vending machines than that already imposed by the state, but rather, as the sole statutory delegation of power for a municipality to regulate, but not prohibit outright, cigarette vending machines. We agree with the defendants that the town's power to adopt an ordinance regarding cigarette vending machines is not derived exclusively from § 12-289a (h), but, rather, emanates from the general police powers of municipalities to "[p]rovide for the health of the inhabitants of the municipality and do all things necessary or desirable to secure and promote the public health . . . ." General Statutes § 7-148 (c) (7) (H) (xi). Therefore, as the defendants maintain, in the absence of a clear legislative directive in § 12-289a (h), "it simply cannot be said that the ordinance, as a valid exercise of the [t]own's police power, irreconcilably conflicts with a statute that ensures that a municipality retains its power to enact provisions ensuring the health, safety and welfare of its inhabitants." We therefore conclude that the legislature intended to preserve municipal authority to enact health, safety and welfare ordinances that preserve and promote the well-being of the municipality's inhabitants, and that, by enacting § 12-289a (h), the legislature intended to ensure that municipalities remained free to decide if local conditions warranted additional regulation of the machines, up to and including an outright ban. Thus, rather than preempt municipal authority to regulate cigarette vending machines by adopting, at the state level, placement restrictions on cigarette vending machines, the legislature left the municipal police authority intact.

We have no quarrel with the plaintiff's contention that when a local ordinance irreconcilably conflicts with a state statute, the local regulation is preempted. The plaintiff suggests that a conflict exists because § 12-289a (h) allows municipalities "to impose more restric-

tive conditions on the use of vending machines for the sale of cigarettes" but not to prohibit them. Thus, the core of the plaintiff's argument is that the power to regulate does not include the power to prohibit. The plaintiff views § 12-289a (h) as "a hull, so to speak, [within which] to allow municipal regulation to take place." Specifically, the plaintiff interprets § 12-289a (h) as allowing towns to regulate only the *placement* of the machines, not the time during which they may be used. It argues that the phrase "more restrictive conditions on the use" implies that cigarette vending machines will continue to be used, and is therefore evidence that the legislature did not contemplate that a municipality could impose a total ban on the machines. The plaintiff's view of the term "restrict," however, fails to provide a workable interpretation of the statute, and raises essentially the same claim that this court expressly rejected in *Beacon Falls* v. *Posick*, 212 Conn. 570, 563 A.2d 285 (1989).

In *Beacon Falls*, the court considered whether a local ordinance that prohibited the use of real property as a landfill was invalid when the property owner had received a permit from the state department of environmental protection to open a landfill within the town. Id., 583; see General Statutes (Rev. to 1985) § 22a-208 (c). The property owner claimed that the term "regulate" in the statute necessarily barred the municipality from imposing a prohibition, relying on this court's language in *Blue Sky Bar, Inc.* v. *Stratford*, supra, 203 Conn. 20, that that term "necessarily impl[ied] . . . the continued existence of that which [was] regulated." In affirming the validity of the prohibition, the court in *Beacon Falls* addressed the question that had been left open in *Blue Sky Bar, Inc.*, specifically, under what circumstances a complete prohibition of an activity that the state regulates but has not banned is permissible.

The court explained in *Beacon Falls* that, although it had stated previously in *Blue Sky Bar, Inc.* v. *Stratford,* supra, 203 Conn. 20, that " 'the power to regulate . . . does not *necessarily* imply the power to prohibit absolutely any business or trade,' " it did not conclude therein that the power to prohibit the activity was precluded. (Emphasis in original.) *Beacon Falls* v. *Posick,* supra, 212 Conn. 582. In *Blue Sky Bar, Inc.,* the court had recognized that every regulation could result in prohibition, stating that the power to regulate entails a certain degree of prohibition. *Blue Sky Bar, Inc.* v. *Stratford,* supra, 20. Indeed, "it requires no citation of authority to say that regulation may in many instances result in prohibition." (Internal quotation marks omitted.) Id. In *Beacon Falls* v. *Posick,* supra, 584, however, the court explained that, when the authority to impose restrictions, at least in part, stems from a municipality's police power, such ordinances must foster the public health, safety and general welfare of the community. "Therefore, when a statute authorizes a municipality to regulate a certain activity, a prohibition of that activity will be valid if it is rationally related to the protection of the community's public health, safety and general welfare." Id.[10]

The ordinance at issue in this case clearly meets this standard. As the plaintiff acknowledged in the stipulation of facts submitted to the trial court, "[t]he [t]own . . . has a legitimate interest in promoting the health, safety and welfare of its citizens through the regulation of tobacco products. [In addition] [t]he [t]own . . . has a legitimate and significant interest in preventing youth access to tobacco products." As the trial court recognized, the minors of the town "have had little difficulty

---

[10] We note that § 12-289a (h) uses the term "restrictive," while the operative term in *Beacon Falls* v. *Posick,* supra, 212 Conn. 583, was "regulate." The terms, however, are susceptible to the same analysis. Every restriction, like every regulation, speaks as a prohibition.

in making illegal purchases of tobacco products from [cigarette vending] machines. [Indeed, a] 1988 survey commissioned by the state department of mental health and addiction services . . . demonstrated that minors were successful in their efforts to purchase cigarettes from a vending machine in six out of every ten attempts. . . . [It also showed that] minors have even succeeded in illegally purchasing cigarettes from restricted vending machines, which are designed to prevent the sale of tobacco to minors by requiring a face-to-face transaction with the operator of the machine. A minor is twice as likely to be able to purchase cigarettes from a vending machine as from a convenience store or other over-the-counter outlet." The director of planning for the department of mental health and addiction services testified in the present case that, based on a survey of 15,000 schoolchildren, approximately 36 percent of junior high school students who regularly smoke and 32 percent of high school students who regularly smoke "sometimes or often" purchase their cigarettes from vending machines. He also noted that minors were even able to purchase cigarettes successfully from the so-called "restricted vending machines" 43 percent of the time. Based on the evidence, the trial court recognized that cigarette vending machines are essentially age-blind and, therefore, remain a significant source of tobacco products for minors despite the existence of state laws prohibiting or limiting their placement in areas accessible to minors. Accordingly, the trial court concluded that "[t]he ordinance in question was a product of the [town's] concern, based, inter alia, on the data previously mentioned, that teenage smoking is a public health hazard and that vending machines are a prime source of cigarettes for those youths who wish to smoke them." Given the uncontroverted evidence in this case, the plaintiff does not seriously dispute that the town's ordinance is not rationally related to the

protection of its citizens' health, safety and welfare. Therefore, the ordinance and the statute are not in conflict.

The plaintiff also argues that the ordinance is invalid because it removes a right bestowed on it by the cigarette distributor's license conferred by General Statutes § 12-288.[11] The plaintiff's reliance on the state's licensing provisions, however, is misplaced. The regulatory scheme at issue in this case is prohibitory. In the absence of chapter 214 of the General Statutes, in general, and § 12-288, in particular, the plaintiff could distribute tobacco products without any regulatory controls or state interference. The statutory provisions in chapter 214 do not expressly authorize vending machines, but, rather, they impose a series of limitations or prohibitions on the use of cigarette vending machines.[12] Except for the limitations set forth in § 12-289a; see footnote 1 of this opinion; vending machines may otherwise exist and subsection (h) of § 12-289a is

---

[11] General Statutes § 12-288 provides: "Distributor's license. Each person engaging in, or intending to engage in, the business of selling cigarettes in this state as a distributor shall secure a license from the Commissioner of Revenue Services before engaging or continuing to engage in such business. Subject to the provisions of section 12-286, such license shall be renewable annually. The annual fee for a distributor's license shall be one thousand dollars, provided in the case of a distributor who sells cigarettes as a distributor exclusively to retail stores which such distributor is operating, the fee for such distributor's license shall be: (1) Two hundred fifty dollars annually if such distributor operates less than fifteen such retail stores; (2) five hundred dollars annually if such distributor operates fifteen or more but less than twenty-five such retail stores; and (3) one thousand dollars annually if such distributor operates twenty-five or more such retail stores. Such license shall be valid for a period beginning with the date of license to the thirtieth day of September next succeeding the date of license unless sooner revoked by the commissioner as provided in section 12-295 or unless the person to whom such license was issued discontinues business, in either of which cases the holder of the license shall immediately return it to the Commissioner of Revenue Services."

[12] Indeed, the state retains the exclusive power to license cigarette vending machines.

merely part of a prohibitory statute that enables municipalities to go further, including outright prohibition. As we have stated previously, this is not the first time that this court has rejected a challenge to an ordinance based upon a claim that it irreconcilably conflicted with a permit or license issued by a state agency. See, e.g., *Beacon Falls* v. *Posick*, supra, 212 Conn. 572; see also *Bauer* v. *Waste Management of Connecticut, Inc.*, supra, 234 Conn. 221 (rejecting claim that permit issued by department of environmental protection to construct landfill with maximum height of 190 feet preempted local ordinance limiting maximum height to ninety feet). "[The] test frequently used to determine whether a conflict exists is whether the ordinance permits or licenses that which the statute forbids, or prohibits that which the statute authorizes; if so, there is a conflict. If, however, both the statute and the ordinance are prohibitory and the only difference is that the ordinance goes further in its prohibition than the statute, but not counter to the prohibition in the statute, and the ordinance does not attempt to authorize that which the legislature has forbidden, or forbid that which the legislature has expressly authorized, there is no conflict." *Aaron* v. *Conservation Commission*, supra, 183 Conn. 544. The town ordinance in this case merely goes further than the statute.

We recognize that the state has a significant interest in monitoring youth access to tobacco, as it should. Simply because the legislature has chosen to legislate on the subject does not mean, however, that the municipalities are without the power to regulate activities with local effects. If that were the case, municipalities would have been powerless to pass many of the ordinances that this court has approved already.

The issue of youth access to tobacco also is very much a local matter. "While restrictions upon minors of access to cigarettes can be the subject of uniform

state-wide regulation, sale of cigarettes to minors within the borders of a municipality is also a matter of municipal concern that can readily be regulated on a local basis." *C.I.C. Corp.* v. *East Brunswick Township*, 266 N.J. Super. 1, 12, 628 A.2d 753 (App. Div. 1993) (state statutory scheme not intended to strip municipalities of police power regarding youth access despite fact that state law regulated, through licensing, distribution of tobacco products through cigarette vending machines). Evidence that the legislature has recognized this concern is found in § 12-289a (h), which ensures that municipalities are free to exercise their traditional police powers and impose additional prohibitions if appropriate.

Once again, simply because a matter is of concurrent state and local concern does not mean that a municipality is prohibited from legislating on the subject. "Where the state legislature has delegated to local government the right to deal with a particular field of regulation, the fact that a statute also regulates the same subject in less than full fashion does not, ipso facto, deprive the local government of the power to act in a more comprehensive, but not inconsistent, manner." *Aaron* v. *Conservation Commission*, supra, 183 Conn. 543. Because the ordinance does not frustrate the state's objective in limiting youth access to tobacco products, and indeed, is fully consistent with that purpose, it is valid.[13]

---

[13] To the extent that the plaintiff suggests that the ordinance frustrates a legislative purpose of the statute in protecting the vending machine industry, we see no authority for that claim. Merely because the state stopped short of imposing a ban on cigarette vending machines does not translate into an intent by the legislature to preserve the vending machine industry. Certainly, if that had been the intent, we would be hard pressed to understand why the legislature would have adopted subsection (h) of § 12-289a preserving municipal authority to regulate cigarette vending machines. Nor can it be argued legitimately that the ordinance frustrates the state's statutory scheme with respect to taxation. Anyone who purchased cigarettes from vending machines could simply buy them elsewhere and pay state taxes on that transaction.

Finally, we note that if the legislature had wanted to preempt the town from enacting such an ordinance, it could have done so. In General Statutes § 19a-342 (f), we see an example of the legislature doing just that ("[t]he provisions of this section shall supersede and preempt the provisions of any municipal law or ordinance relative to smoking effective prior to, on or after October 1, 1993"). In the absence of a clear expression of intent to preclude local action, we conclude that the ordinance and the statute can coexist peacefully.

The judgment of the trial court is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion BORDEN, NORCOTT, PALMER and VERTEFEUILLE, Js., concurred.

MCDONALD, C. J., with whom SULLIVAN, J., joins, dissenting. While I wholeheartedly agree that control of access to addictive tobacco products by young people is entirely desirable, I cannot find in General Statutes § 12-289a authority for towns to prohibit all sales of tobacco products by cigarette vending machines. The statute, while delegating to the towns authority to regulate cigarette vending machines, simply fails to give the towns authority to forbid their use entirely.

In *Blue Sky Bar, Inc.* v. *Stratford,* 203 Conn. 14, 20, 523 A.2d 467 (1987), we observed that the power to regulate an activity given to a town by a state statute does not necessarily imply the power to prohibit an activity absolutely. This is because "regulating" an activity implies that it is allowed to exist. We said: "It is fair to say that the power to regulate, however, does not necessarily imply the power to prohibit absolutely any business or trade, as the very essence of regulation, which infers limitations, is the continued existence of that which is regulated." Id. In *Blue Sky Bar, Inc.,* we found that there was no prohibition of street sales of

ice cream products since only sales from motor vehicles were prohibited by Stratford. Id., 21. We concluded that Stratford did not prohibit all street sales but merely regulated the manner in which they were done. Id.

The plain words of § 12-289a, allowing for more restrictive conditions on the use of cigarette machines, assume the continued existence of that which is to be regulated; id., 14; or, as the majority recognizes, to be restricted. See footnote 10 of the majority opinion.

This case is distinguishable from *Blue Sky Bar, Inc.*, because the activity being regulated by § 12-289a is not all sales of cigarettes but sales by use of cigarette vending machines. Orange's ordinance, therefore, does entirely prohibit cigarette machine sales, an activity directly regulated by the state under General Statutes § 12-289.[1] Accordingly, I would conclude that *Blue Sky Bar, Inc.*, rather than supporting the majority's position, supports the trial court.

I would also conclude that nothing in *Beacon Falls* v. *Posick*, 212 Conn. 570, 563 A.2d 285 (1989), supports the majority. In *Beacon Falls*, we found that local zoning ordinances were not preempted by a state statute. Id., 586. We said: "Because the statutory terms are clear, we must assume that the legislature intended only to preempt local zoning authority to the extent that it conflicted with the operation of a CRRA [Connecticut Resources Recovery Authority] facility on property owned by the CRRA prior to May 11, 1984, and we cannot construe the act otherwise. . . . Accordingly, by its terms, [the act] cannot be construed to have preempted all local zoning with regard to the location of solid waste disposal areas." (Citations omitted.) Id., 579. *Beacon Falls* is not relevant to the present case.

---

[1] Section 12-289a follows § 12-289, which requires that each cigarette vending machine used in Connecticut be licensed by the state of Connecticut.

The majority's reliance on the town's general authority to exercise police powers for public health would, if taken to the extreme, authorize towns to prohibit any activity regulated and authorized by state statute. This would be in contradiction to the state's power to govern within the 169 towns and would make each town a sovereign power. Each town is, however, merely an instrumentality of the state and not a sovereign. See *State* v. *Miller*, 227 Conn. 363, 372–73, 630 A.2d 1315 (1993) ("Municipalities, because they are creations of the state, have no inherent legislative authority. . . . Rather, the legislative authority of municipalities derives solely from express legislative grants." [Citation omitted; internal quotation marks omitted.]); *Buonocore* v. *Branford*, 192 Conn. 399, 401, 471 A.2d 961 (1984) ("[i]t is settled law that as a creation of the state, a municipality has no inherent powers of its own" [internal quotation marks omitted]). Under the majority's theory, a town could restrict certain state licensed motor vehicle operators from driving in that town and create chaos on our highways.

Furthermore, the legislature has in the past shown that it knows how to grant towns power to prohibit state authorized and regulated activities. In General Statutes § 30-9, the legislature granted municipalities the power to prohibit within their boundaries the sale of alcoholic beverages, a state regulated activity. It may be that cigarette smoking by young people should be discouraged by the legislature by giving towns authority to ban cigarette vending machine sales within the towns in the same way as it gave them the authority under § 30-9 to ban sales of alcoholic beverages. This has not yet occurred.

The majority finds a legislative intent to grant towns a power to prohibit state regulated activity in the face of the legislature's failure to grant such a power explicitly. In doing so, this court, while adopting the guise of

"the least dangerous branch"[2] of government, in effect becomes the legislature. Our role is properly that of an interpreter of the laws and not that of law giver. Under our constitution, the power to legislate belongs to those elected by the people and not to appointed judges. Judges should not be social engineers. See *Claremont School District* v. *Governor*, 142 N.H. 462, 477, 703 A.2d 1353 (1997) (Horton, J., dissenting). Although I admire the majority's intention and goal, I believe that law should be made by lawmakers who present their views to the people and whose power rests upon the people's support.

Our state led our country in establishing a system of government that directly responds to the will of the people. We must be careful to maintain that system.

I respectfully dissent.

---

[2] In the Federalist Papers, Alexander Hamilton described the judiciary as the "least dangerous" department of power because it has "neither force nor will, but merely judgment . . . ." A. Hamilton, Federalist No. 78 (Rev. Ed. 1901), p. 428. This requires the judiciary to remain truly distinct from the legislature and the executive. Id.

