GREATER NEW HAVEN PROPERTY OWNERS
ASSOCIATION *v.* CITY OF NEW HAVEN
(SC 17900)

Rogers, C. J., and Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued February 7—officially released July 29, 2008

*Martin S. Echter*, for the appellant (plaintiff).

*Audrey C. Kramer*, assistant corporation counsel, with whom, on the brief, was *Michael A. Wolak III*, assistant corporation counsel, for the appellee (defendant).

*Opinion*

SCHALLER, J. This appeal requires us to consider the scope of authority granted to municipalities by General Statutes § 7-148 (c) (7) (A).[1] In this action for a declaratory judgment and injunctive relief, the plaintiff, the Greater New Haven Property Owners Association,[2] appeals from the judgment rendered in favor of the defendant, the city of New Haven (city), following a trial to the court.[3] On appeal, the plaintiff claims that the trial court improperly concluded that: (1) § 7-148 (c) (7) (A) authorized the city to adopt §§ 17-13.1 through 17-13.16 of the New Haven Code of Ordinances (ordinance), which impose licensing and inspection requirements upon certain residential rental properties; (2) the plaintiff lacked standing to challenge the consti-

[1] General Statutes § 7-148 (c) provides in relevant part: "Any municipality shall have the power to do any of the following, in addition to all powers granted to municipalities under the Constitution and general statutes . . . .

"(7) . . . (A) . . . (i) Make rules relating to the maintenance of safe and sanitary housing;

"(ii) Regulate the mode of using any buildings when such regulations seem expedient for the purpose of promoting the safety, health, morals and general welfare of the inhabitants of the municipality . . . ."

[2] The plaintiff is a voluntary association that represents the interests of its members, approximately fifty individuals or entities who collectively own and/or manage more than one thousand residential rental units within the city of New Haven that are subject to the ordinance. Hereinafter, we refer to the plaintiff's individual members as property owners.

[3] The plaintiff appealed from the judgment of the trial court to the Appellate Court and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

tutionality of a provision in the ordinance authorizing the city to obtain an administrative warrant from the Superior Court to compel inspections of rental units when tenants have refused access to the inspectors; (3) the ordinance did not violate the property owners' right to procedural due process; (4) the ordinance did not violate the property owners' right to substantive due process; and (5) the ordinance did not constitute a taking without just compensation. We affirm the judgment of the trial court.

The trial court summarized the relevant facts found in its memorandum of decision. "In August of 2005, the board of aldermen for the city of New Haven approved an ordinance establishing a program of 'Residential Rental Property Licensing and Inspection.' Based on a premise of commitment 'to protecting the safety, health and welfare of its residents and to eliminating housing blight,' the ordinance established a procedure whereby virtually all owners of residential rental properties would be required to submit an application seeking licensure by the city.

"Section 17-13.4 (a) of the [ordinance] states: 'Upon adoption of this article, it shall be unlawful for owner(s) of certain residential rental property located within [the city] to operate/rent such property without obtaining a residential rental property license. This section shall apply to the following residential rental property classifications: 1) owner-occupied dwellings containing three . . . or more rental units; and 2) non-owner occupied dwellings containing two . . . or more rental units.' The ordinance requires a fee of $75 for a two year license for each such structure with two or three residential units; $150 for those with four to ten units; $250 for those with eleven to twenty units; and $375 for those with over twenty units. Certain types of rental property are exempt from licensure. The licenses are not transferable, and any change in ownership must be reported

within thirty days of the transfer of title. The new owner must then apply for a new residential rental property license and may not rent the property without obtaining such a license.

"The ordinance also includes provisions for inspections of rental property and for a variety of penalties for such things as failing to obtain a license, failing to attend inspections, and failing follow-up inspections. There are procedures for appeals and also for the city to seek an 'administrative warrant' from the Superior Court to compel inspections of rental units if their tenants refuse access to the inspectors."

Following a trial, the court rendered judgment in favor of the city. This appeal followed.

I

We first address the plaintiff's claim that the trial court improperly concluded that the city had authority pursuant to § 7-148 (c) (7) (A) to adopt the ordinance. The plaintiff contends that the ordinance conflicts with § 7-148 because it empowers the city to require residential rental real estate owners to obtain licenses, despite the fact that such licensing is not expressly authorized in § 7-148.[4] The trial court concluded, and the city now

[4] The plaintiff also argues that the ordinance conflicts with General Statutes § 47a-57, which provides procedures for the issuance of certificates of occupancy for municipalities that elect to adopt the provisions of § 47a-57. Specifically, § 47a-57, if adopted by a municipality, requires that, following a vacancy, a certificate of occupancy, certifying that the rental unit "conforms to the requirements of the applicable housing ordinances of such municipality and this chapter" be issued for an "apartment or dwelling unit in any structure containing three or more housing units" before the unit may be occupied again. General Statutes § 47a-57 (a). The plaintiff argues that the ordinance conflicts with § 47a-57 because it imposes more stringent requirements than the requirements of § 47a-57. Specifically, the plaintiff argues that the statutory scheme of which § 47a-57 is a part provides more protection for property owners charged with violations, allows the certificates to be transferred to new owners, and does not provide for the issuance of administrative warrants.

The trial court, however, specifically noted in its memorandum of decision that, during trial, the city represented that its legislative body had not adopted

argues, that the grant of authority in § 7-148 is sufficiently broad to encompass the power to require licensing and inspections of residential rental real estate. We agree with the trial court.

Section 7-148 (c) (7) (A) grants to municipalities regulatory and police powers over buildings, including the power to: "(i) Make rules relating to the maintenance of safe and sanitary housing; [and] (ii) Regulate the mode of using any buildings when such regulations seem expedient for the purpose of promoting the safety, health, morals and general welfare of the inhabitants of the municipality . . . ." The statute supplies no limitation on how municipalities may make and implement such rules and regulations—it merely states that municipalities have the power to do so. The only apparent limit on the face of the statute is that the rules and regulations be related to "safety, health, morals and general welfare . . . ." This grant of police power to municipalities is sufficiently broad to encompass the power to require licensing and inspections of residential rental real estate.

Our reading of the statutory language is confirmed by the reasoning in relevant case law. *Modern Cigarette, Inc.* v. *Orange*, 256 Conn. 105, 774 A.2d 969 (2001), involved a similar claim to that raised by the plaintiff in the present case. The plaintiff in *Modern Cigarette, Inc.*, claimed that an ordinance enacted by the town of Orange (Orange ordinance) was invalid because it conflicted with and was preempted by the pertinent provisions of the General Statutes. Id., 106–107. The Orange ordinance was aimed at reducing the illegal

the provisions of § 47a-57, and that the plaintiff did not contest that representation. The plaintiff does not claim on appeal that the city has adopted § 47a-57. Accordingly, because § 47a-57 by its own terms is applicable only to a municipality that "adopts the provisions of this section by vote of its legislative body"; General Statutes § 47a-57 (a); any inconsistency that the ordinance may have with § 47a-57 is not relevant to the validity of the ordinance.

purchase of cigarettes by minors. Id., 113–14. The plaintiff claimed that the Orange ordinance was preempted by General Statutes § 12-289a, which restricts the placement of cigarette vending machines to areas accessible only to adults, but does not ban them entirely. Id., 122. Section 12-289a further provides that a town may impose "more restrictive conditions on the use of vending machines," but does not state expressly that a town may ban the machines altogether. Id., 124. The trial court had reasoned that § 12-289a preempted the Orange ordinance on the basis of the fact that § 12-289a authorized municipalities to enact only "more restrictive conditions," and did not expressly authorize municipalities to impose an outright ban. Id.

We disagreed, based on the broad grant of authority to municipalities pursuant to § 7-148 and on our conclusion that the Orange ordinance did not "irreconcilably [conflict]" with § 12-289a. Id., 119. We first observed that statutory authority for the Orange ordinance derived not only from § 12-289a, but also from § 7-148, which constitutes a "broad statutory mandate authorizing regulations at both the state and local levels . . . ." Id., 122. The statutory scheme of § 7-148, we noted, "envisages its adaptation to infinitely variable conditions for the effectuation of the purposes of these statutes." (Internal quotation marks omitted.) Id. The test for determining the validity of a municipal ordinance enacted pursuant to § 7-148 is whether it is " 'reasonably calculated' " to achieve public health, safety and welfare. Id., 118. In other words, a municipal ordinance "must have a rational relationship to its objective." (Internal quotation marks omitted.) Id. We explained: "The [s]tate may regulate any business or the use of any property in the interest of the public welfare or the public convenience, provided it is done reasonably. . . . The limit of the exercise of the police power is necessarily flexible, because it has to be considered in

the light of the times and the prevailing conditions. . . . Whether the times and conditions require legislative regulation, as well as the degree of that regulation, is exclusively a matter for the judgment of the legislative body . . . . Courts can interfere only in those extreme cases where the action taken is unreasonable, discriminatory or arbitrary. . . . Every intendment is to be made in favor of the validity of [an] ordinance and it is the duty of the court to sustain the ordinance unless its invalidity is established beyond a reasonable doubt. . . . [T]he court presumes validity and sustains the legislation unless it clearly violates constitutional principles. . . . If there is a reasonable ground for upholding it, courts assume that the legislative body intended to place it upon that ground and was not motivated by some improper purpose. . . . This is especially true where the apparent intent of the enactment is to serve some phase of the public welfare." (Internal quotation marks omitted.) Id.

The licensing and inspection requirements of the ordinance in the present case are rationally related to its purpose, as set forth in § 17-13.3 (a) of the ordinance, "to protect the safety, health and welfare of the people of the city, and in order to prevent blight . . . ." Under § 17-3.4 (a) of the ordinance, the licensing and inspection requirements apply to "owner-occupied dwellings containing three . . . or more rental units; and . . . non-owner occupied dwellings containing two . . . or more rental units." In order for a license to be issued, § 17-13.5 of the ordinance requires that the residential rental property "must pass an inspection by a city code inspector . . . ." In addition, § 17-13.7 (a) of the ordinance provides that "[a]ll inspections will be performed according to a defined checklist of quality of life and life safety issues as outlined in the corresponding regulations." Under § 17-13.7 (b), the property must "[meet] the minimum housing code standards as outlined in the

city's regulations" in order to pass inspection and be eligible for licensing. Section 17-13.7 (f) and (g) of the ordinance provide reporting requirements in the event that an inspector discovers "life-threatening" or "non-life threatening health and/or safety defects"; and § 17-13.7 (i) provides for time limitations for any necessary repairs to correct defects subsequent to an inspection. Once obtained, § 17-13.10 of the ordinance provides that a license is valid for two years, "unless otherwise voided as a result of a subsequently discovered defect, a property transfer or other just cause as determined by the code enforcement officer."

The entire scheme of the ordinance, which conditions the issuance of a license upon passing inspection, and tailors the inspection requirements specifically to ensure that owners of residential rental properties comply with the city's minimum housing code standards, is aimed at promoting public health and safety by ensuring that rental housing is maintained in accordance with the housing code standards. Conditioning the issuance of the license on the inspection provides a means of ensuring that owners are complying with these standards, which bear a rational relationship to the goal stated in § 17-3.13 (a) of the ordinance, "to protect the safety, health and welfare of the people of the city, and in order to prevent blight. . . ." Accordingly, we conclude that the city had the authority, pursuant to § 7-148 (c) (7) (A), to enact the ordinance.

The plaintiff contends that the ordinance conflicts with § 7-148, because it requires licensing and inspection of residential rental real estate, while § 7-148 does not expressly provide for licensing or inspection of such properties. The plaintiff specifically relies on the fact that § 7-148 does expressly provide for licensing in other areas, including: parked trailers and trailer parks; General Statutes § 7-148 (c) (7) (A) (iv); the business of peddlers, auctioneers and junk dealers; General Stat-

utes § 7-148 (c) (7) (H) (iv); the operation of amusement parks and amusement arcades; General Statutes § 7-148 (c) (7) (H) (vi); and all sports, exhibitions, public amusements and performances and all places where games may be played. General Statutes § 7-148 (c) (7) (H) (vii). Relying on the principle that, "[u]nless there is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive"; (internal quotation marks omitted) *Commissioner of Environmental Protection* v. *Mellon*, 286 Conn. 687, 693, 945 A.2d 464 (2008); the plaintiff contends that these express provisions for licensing, coupled with the failure to provide expressly for municipal authority to issue licenses for residential rental real estate, justify the inference that § 7-148 does not authorize licensing for residential rental real estate, and that the ordinance imposes higher standards than the statute by requiring such licensing. Therefore, the plaintiff contends, the ordinance is inconsistent with § 7-148, and the city lacked authority pursuant to the statute to pass it.

We previously have concluded that an ordinance does not conflict with a statute merely by imposing standards stricter than those imposed by the statute. "Whether an ordinance conflicts with a statute or statutes can only be determined by reviewing the policy and purposes behind the statute and measuring the degree to which the ordinance frustrates the achievement of the state's objectives. . . . Therefore, [t]hat a matter is of concurrent state and local concern is no impediment to the exercise of authority by a municipality through the enactment of an ordinance, so long as there is no conflict with the state legislation. . . . Where the state legislature has delegated to local government the right to deal with a particular field of regulation, the fact that a statute also regulates the same subject in less than full fashion does not, ipso facto, deprive the local

government of the power to act in a more comprehensive, but not inconsistent, manner. . . .

"Therefore, merely because a local ordinance, enacted pursuant to the municipality's police power, provides higher standards than a statute on the same subject does not render it necessarily inconsistent with the state law. Whether a conflict exists depends on whether the ordinance permits or licenses that which the statute forbids, or prohibits that which the statute authorizes. If, however, both the statute and the ordinance are prohibitory and the only difference is that the ordinance goes further in its prohibition than the statute, but not counter to the prohibition in the statute, and the ordinance does not attempt to authorize that which the legislature has forbidden, or forbid that which the legislature has expressly authorized, there is no conflict. . . . Where a municipal ordinance merely enlarges on the provisions of a statute by requiring more than a statute, there is no conflict unless the legislature has limited the requirements for all cases." (Citations omitted; internal quotation marks omitted.) *Modern Cigarette, Inc.* v. *Orange*, supra, 256 Conn. 119–20.

There is no conflict between § 7-148 and the ordinance. Although § 7-148 does not expressly authorize municipalities to require licensing and inspections of residential rental real estate, the statute does not prohibit such requirements, and those requirements do not "[frustrate] the achievement of the state's objectives." (Internal quotation marks omitted.) Id., 119. Therefore, the city's means of achieving the purposes set out in § 7-148 are within the ambit of the statute's broad grant of authority to municipalities. As the trial court pointed out, "the legislature, in enacting [§ 7-148], made no effort to enumerate the precise forms that such rules and regulations might take. Rather, it is apparent that the legislature purposefully used broad and general

terms in the statute to allow municipalities to address 'safety, health, morals and general welfare' issues intelligently and effectively."

We also are not persuaded by the plaintiff's argument that the legislature intended to limit the municipal power to grant licenses to those areas specifically enumerated in § 7-148. In resolving this issue, several points in the trial court's memorandum of decision bear repeating. First, the trial court noted that the "contexts in which licensing is specifically mentioned within § 7-148 (c) are all areas in which licensing is required by other state statutes."[5] Second, the court noted that § 7-148 conveys to municipalities the power to "regulate" the mode of use of buildings, and that licensing is a tool by which a governing body routinely carries out its regulatory powers. Third, the court noted that § 7-148 empowers municipalities to promote regulations that are "expedient for the purpose of promoting the safety, health, morals and general welfare of the inhabitants of the municipality . . . ." (Internal quotation marks omitted.) As the trial court noted, the term "expedient" means "suitable for achieving a particular end in a given circumstance . . . ." The court concluded, and we agree, that the structure and language of the statute are not consistent with the narrow interpretation advocated by the plaintiff, limiting a municipality's power to license specifically to those areas enumerated in § 7-148. Instead, the language of the statute supports the conclusion that the legislature intended § 7-148 to constitute a broad grant of authority to municipalities,

[5] See, e.g., General Statutes § 14-12 (requiring registration of motor vehicles, definition of which includes trailers); General Statutes § 21-37 (authorizing municipalities to issue permits to peddlers); General Statutes § 14-67l (motor vehicle recycler's [junk dealer's] license); General Statutes § 29-129 (licensing of amusement parks); General Statutes § 30-33b (special sporting facility permits); General Statutes § 29-143j (licensing of sponsors and participants of boxing matches); General Statutes § 12-574 (licensing for racing and jai alai).

a grant that reasonably includes the power to issue licenses for residential rental real estate.

## II

We next address the plaintiff's claim that the trial court improperly concluded that it lacked standing to challenge the constitutionality of provisions in the ordinance that authorized the city to obtain an administrative warrant from the Superior Court to compel inspections of rental units if tenants refuse access to the inspectors.[6] The plaintiff claims that the administrative searches provided for in the ordinance would constitute unreasonable searches in violation of the fourth and fourteenth amendments to the United States constitution, and article first, § 7, of the constitution of Connecticut.[7] The trial court reasoned that, because the property owners lacked a privacy interest in the rental units that would be subject to the administrative warrants, they, and therefore, the plaintiff, would lack standing to challenge any search of a rental unit pursuant to an administrative warrant. The plaintiff argues that because a vacant apartment is under the exclusive control of the

---

[6] Section 17-13.8 of the ordinance provides: "Before a code inspector can inspect a residential rental property unit, the tenant(s) of such unit must consent to its inspection. If such tenant(s) object to such inspection, the code enforcement officer must obtain an administrative warrant before the code inspector can conduct an inspection of that unit."

Section 17-13.7 (d) of the ordinance provides in relevant part: "The code inspector will have discretion to select and inspect a representative sampling of rental units . . . within residential rental property containing at least twenty . . . such units for purposes of inspection. Such selection shall be made by a statistically random process and is restricted to those rental units which have been authorized for inspection by their respective tenants. An administrative warrant is needed in order to inspect rental units which have not been authorized for inspection by their respective tenants. . . ."

[7] Because we conclude that the plaintiff lacks standing, it is not necessary to analyze its state and federal constitutional claims. We note, however, that the plaintiff does not supply a separate state constitutional analysis of its claim pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). See footnote 9 of this opinion.

owner, and because the owner or its agent is required to be present during an inspection,[8] the plaintiff had standing to challenge the administrative warrants provisions. We agree with the trial court.

A person has standing to raise a fourth amendment challenge to a search only if that person "has a legitimate expectation of privacy in the invaded place." *Rakas* v. *Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). "In order to meet this rule of standing . . . a two-part subjective/objective test must be satisfied: (1) whether the [person contesting the search] manifested a subjective expectation of privacy with respect to [the invaded premises]; and (2) whether that expectation [is] one that society would consider reasonable. . . . This determination is made on a case-by-case basis. . . . Whether a [person's] actual expectation of privacy . . . is one that society is prepared to recognize as reasonable involves a fact-specific inquiry into all the relevant circumstances." (Internal quotation marks omitted.) *State* v. *Hill*, 237 Conn. 81, 92, 675 A.2d 866 (1996). It is well established that a tenant has standing to claim the protection of the fourth amendment with respect to "areas where his use is exclusive, that is, where he has the legal right to control access and to exclude others." (Internal quotation marks omitted.) *State* v. *Sealy*, 208 Conn. 689, 693, 546 A.2d 271 (1988). Generally speaking, however, a landlord cannot lawfully consent to a search of his tenant's premises. *Chapman* v. *United States*, 365 U.S. 610, 615–18, 81 S. Ct. 776, 5 L. Ed. 2d 828 (1961).

---

[8] Section 17-13.7 (c) of the ordinance provides in relevant part: "The owner or his/her agent must be present at each inspection of the residential rental property. Additionally, he/she must give at least seven . . . days notice of the inspection to the tenant(s) residing within the residential rental property unit(s). Each tenant shall have the option(s) of allowing access into his/her rental unit for purposes of an initial inspection, and to be present at the re-inspection(s) of said unit."

The plaintiff appears to be advancing two arguments. With respect to units occupied by tenants, the plaintiff appears to claim that the requirement that landlords be present during the inspections somehow confers standing on the landlords and, therefore, on the plaintiff. The plaintiff does not, however, cite to any authority to support its apparent contention that the requirement that landlords be present during an inspection of occupied premises creates in the landlords a legitimate expectation of privacy. With respect to vacant units, the plaintiff claims that landlords have exclusive control over those units, and therefore have standing to challenge the administrative warrants provisions of the ordinance. An administrative warrant, however, may be issued under §§ 17-13.7 (d) and 17-13.8 of the ordinance only if the tenant has not authorized access for inspection purposes. Because a vacant unit would have no tenant, the administrative warrant procedure does not apply in the case of a vacant unit.

III

The plaintiff raises several additional constitutional claims, arguing that the trial court improperly concluded that the ordinance did not violate the property owners' right to procedural or substantive due process, and that the ordinance did not constitute a taking without just compensation. With respect to all three claims, the plaintiff bears the heavy burden of showing that the ordinance is unconstitutional beyond a reasonable doubt. *Kinney* v. *State*, 285 Conn. 700, 710, 941 A.2d 907 (2008) ("legislative enactments carry with them a strong presumption of constitutionality, and . . . a party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt" [citations omitted; internal quotation marks omitted]). The plaintiff fails to satisfy this burden on any of its constitutional challenges to the ordinance.

The plaintiff first claims that the ordinance violated its right to procedural due process under both the federal and state constitutions.[9] Specifically, the plaintiff claims that its members, as property owners; see footnote 2 of this opinion; acquired a property interest in the certificates of occupancy[10] and other

[9] Because the plaintiff does not supply a "separate state constitutional analysis of its claim pursuant to *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), we deem that claim abandoned and analyze the [plaintiff's] . . . arguments under the requirements of the United States constitution." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 651 n.17, 945 A.2d 449 (2008).

[10] At trial, the parties referred to two types of certificates of occupancy authorized by the General Statutes, those obtained in compliance with General Statutes § 47a-57, which are specifically for apartments or dwelling units *in* a structure, and those obtained for the structures themselves, in compliance with the State Building Code (code), General Statutes § 29-251 et seq. As we have explained in part I of this opinion, the certificate of occupancy set forth in § 47a-57, as well as the procedures and protections attendant to such certificates, are not relevant to the validity of the ordinance, since the city has not adopted § 47a-57.

Andrew Rizzo, the city building official, testified that, pursuant to the code, all structures in the city must have a certificate of occupancy, which certifies the purpose for which the structure can be used. Under the code; see General Statutes § 29-265 (a); a certificate of occupancy is issued at the time that a structure is "erected or altered." General Statutes § 29-265 (a) provides in relevant part: "[N]o building or structure erected or altered in any municipality after October 1, 1970, shall be occupied or used, in whole or in part, until a certificate of occupancy, as defined in the regulations adopted under section 29-252, has been issued by the building official, certifying that such building, structure or work performed pursuant to the building permit substantially conforms to the provisions of the State Building Code and the regulations lawfully adopted under said code. . . ." We have noted that "[p]ursuant to the regulations promulgated [under General Statutes § 29-252], a certificate of occupancy also certifies, inter alia, that the subject premises conform with local zoning regulations and the State Fire Safety Code and, for certain proposed structures or additions to structures, that the premises conform to building plans on file. See Regs., Conn. State Agencies § 29-252-1d, as amended by §§ 110.1.2 through 110.1.4 of the State Building Code (2005 Sup.)." *A & M Towing & Recovery, Inc.* v. *Guay*, 282 Conn. 434, 440–41, 923 A.2d 628 (2007).

Although the plaintiff's brief is less than clear as to which type of certificate it relies on in claiming that the ordinance implicates a property interest protected by the due process and takings clauses of the federal constitution, it appears that the plaintiff alleges that the certificates that the property

permits[11] that they have been issued, and that the licensing requirement deprives the property owners of the full benefit of the certificates of occupancy by prohibiting them from leasing a unit absent compliance with the inspection and licensing requirements of the ordinance. Additionally, the plaintiff argues that the section of the ordinance that provides that the licenses are not transferable upon the sale of the property deprives the property owners of the property interest they had acquired in the licenses without due process.[12]

owners have obtained pursuant to the code create the property interest the alleged deprivation of which gives rise to the plaintiff's constitutional claims. The plaintiff alleged repeatedly during trial that all of the property owners possess certificates of occupancy. Since the city has not adopted § 47a-57, the code certificates are the only certificates to which the plaintiff could have been referring. At trial, the plaintiff introduced a certificate of occupancy as an exhibit. The certificate states that the subject structure substantially complies with the building and zoning ordinances of the city and is suitable for the stated purpose of the structure, which is stated as "Residential R-2." The certificate also states that "[t]he only purpose of this certificate is to approve the lawful use of this building as shown from records on file in this department. [No] responsibility is assumed for conformance with the present building, electrical, plumbing or heating codes, except in certain portions where work has been done and approved by this department since these respective codes have been adopted." The certificate states that it is for the entire six-story building, comprised of seventy-two dwelling units. The plaintiff's reliance on this certificate, which is consistent with the provisions of the code, supports our interpretation that the plaintiff bases its asserted property interest on certificates issued pursuant to the code. Accordingly, references in this section of the opinion to certificates of occupancy are to certificates obtained pursuant to the code.

[11] At trial, the plaintiff presented testimony that some property owners had obtained elevator and boiler permits. On appeal, the plaintiff does not specify the nature of the permits that allegedly create a protected property interest, and does not explain the manner in which the ordinance allegedly deprives the property owners of their protected interest in the permits. Because of the vague nature of the plaintiff's claim based on the permits, we confine our analysis to its stated property interest in the certificates of occupancy.

[12] The plaintiff cites to no authority for the proposition that the issuance of a license that is not transferable upon the sale of the property somehow deprives the property owners of the full benefit of the license. Even if we were to conclude that the property owners acquired a protected property interest in the licenses, that interest was always subject to the limits inherent

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the [d]ue [p]rocess [c]lause of the . . . [f]ourteenth [a]mendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Under *Mathews*, the Supreme Court applies a three part test that "requires a consideration of the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards . . . and . . . the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) *Sassone* v. *Lepore*, 226 Conn. 773, 781, 629 A.2d 357 (1993).

We first address whether the nature of the plaintiff's asserted interest, namely its claimed property interest in the certificates of occupancy, is one that is protected by the federal constitution. Property interests protected by the fourteenth amendment "may take many forms." *Board of Regents* v. *Roth*, 408 U.S. 564, 576, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a

---

in the ordinance, including the time limit of two years and the nontransferability of the licenses. The mere fact that the plaintiff would have preferred that the property owners be granted licenses unlimited in time and transferable upon the sale of the property does not render the city's decision not to do so a deprivation of a constitutionally protected property interest.

hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the [c]onstitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Id., 577.

"A statute or ordinance providing procedural guarantees does not create a constitutionally protected property interest unless it sets forth substantive criteria that limit the discretion of the decisionmaking body. *Cain* v. *Larson*, [879 F.2d 1424, 1426 (7th Cir.), cert. denied, 493 U.S. 992, 110 S. Ct. 540, 107 L. Ed. 2d 537 (1989)]; *Fleury* v. *Clayton*, 847 F.2d 1229, 1231 (7th Cir. 1988); see *Olim* v. *Wakinekona*, 461 U.S. 238, 248–51, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983); *Hewitt* v. *Helms*, 459 U.S. 460, 471, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983). . . . Even if the statute includes substantive criteria, a party whose asserted property interest is not related to the substantive criteria but rather is grounded solely in the procedures set forth in the statute does not have a constitutionally cognizable property interest." (Internal quotation marks omitted.) *Giaimo* v. *New Haven*, 257 Conn. 481, 500, 778 A.2d 33 (2001).

The plaintiff claims that the property owners have a property interest in the certificates of occupancy and that the ordinance, by prohibiting the owners of residential rental property from operating or renting such property without a license and by requiring biannual inspections, denies the property owners of the full benefit of their property interest in the certificates. The plaintiff appears to be arguing that unless the certificates of occupancy are the only procedural requirements imposed upon residential rental real estate

owners by the city as a condition to renting the subject properties, they are being deprived of the full benefit of the certificates. The plaintiff, however, provides no explanation as to why the imposition of these additional requirements deprives the property owners of the full benefit of the certificates, and provides no authority in support of this claim.

Moreover, the plaintiff's argument ignores the fact that the certificates of occupancy serve a very different function than the licenses required under the ordinance, and that the standards that govern inspections required under the two regulatory schemes are accordingly distinct. A certificate of occupancy is issued only at the time that a structure originally is erected or when it is modified, and, unlike the license required by the ordinance, it is for the entire building, not for individual dwelling units within a building. General Statutes § 29-265 (a); see footnote 10 of this opinion. In order to be eligible for a certificate of occupancy a building must "substantially [conform]" to the state building code and regulations promulgated thereunder. General Statutes § 29-265 (a). By contrast, as we noted earlier in this opinion, § 17-13.3 (a) of the ordinance states that its underlying purpose is "to protect the safety, health and welfare of the people of the city, and in order to prevent blight . . . ." Section 17-13.7 (b) requires that the license issued under the ordinance "will only be issued if the property meets the minimum housing code standards as outlined in the city's regulations." In summary, a certificate of occupancy certifies merely that a building is suitable for the stated use, for instance, as residential, and that it conforms to building code standards. A license obtained pursuant to the ordinance is much more specifically targeted at insuring that a rental unit complies with housing code standards. The two procedural requirements apply to different objects and address different areas of concern; to say that the

requirement of one deprives a property owner of the full benefit of the other ignores these two significant distinctions. The mere fact that the city, in its discretion under § 7-148, has imposed additional regulatory hurdles by way of the ordinance upon the property owners, consistent with the purpose underlying § 7-148, "of promoting the safety, health, morals and general welfare of the inhabitants of the municipality"; General Statutes § 7-148 (c) (7) (A) (ii); does not deprive the owners of the full benefit of the certificates of occupancy. Nothing in the building code states that a certificate of occupancy carries with it a guaranty that a property owner who obtains one henceforth will be insulated from all further state and municipal regulation with respect to that building.

Even if the ordinance resulted in the deprivation of a benefit associated with the certificates of occupancy, we note that the ordinance provides the opportunity for an appeal. Specifically, § 17-13.16 (a) of the ordinance provides in relevant part: "Any person aggrieved by a denial of a residential rental property license, or by the license's terms or conditions, or by the suspension, cancellation or revocation of such license, may appeal such action by filing a written notice of intent to appeal . . . ." The plaintiff provides no explanation as to why the appeals provision does not constitute the process that is due.

Our conclusion that the ordinance does not deprive the property owners of the benefit of a certificate of occupancy similarly resolves the plaintiff's claim that the ordinance violates the property owners' right to substantive due process. "The substantive component of the [due process clause] . . . protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." (Internal quotation marks omitted.) *Aselton* v. *East Hartford*, 277 Conn. 120, 131, 890 A.2d 1250 (2006).

"It is axiomatic that the due process clause not only guarantees fair procedures in any governmental deprivation of life, liberty, or property, but also encompasses a substantive sphere . . . barring certain government actions regardless of the fairness of the procedures used to implement them . . . . This basic protection embodies the democratic principle that the good sense of mankind has at last settled down to this: that [due process was] intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice. . . .

"Despite the important role of substantive due process in securing our fundamental liberties, that guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. . . . Rather, substantive due process has been held to protect against only the most arbitrary and conscience shocking governmental intrusions into the personal realm that our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. . . . Thus, substantive due process has been held to safeguard such intimate activities as marriage . . . ." (Citations omitted; internal quotation marks omitted.) *ATC Partnership* v. *Windham*, 251 Conn. 597, 605–606, 741 A.2d 305 (1999), cert. denied, 530 U.S. 1214, 120 S. Ct. 2217, 147 L. Ed. 2d 249 (2000).

We already have rejected the plaintiff's claim that the property owners have been deprived by the licensing and inspection requirements of the ordinance of the full benefit of the certificates of occupancy. Even if we were to conclude that the city's requirement that the property owners comply with the licensing and inspection requirements imposed under the ordinance implicates a substantive due process right, our conclusion that the ordinance does not deprive the property owners

of any benefit derived from the certificates of occupancy forecloses the plaintiff's claim that the ordinance deprives the owners of a substantive due process right. That same reasoning leads us to reject the plaintiff's claim that the ordinance constitutes a taking without just compensation. The plaintiff argues that the imposition of the licensing and inspection regulatory requirements negates at least some of the benefit that the owners derive from the certificates of occupancy. As we already have stated in this opinion, the mere fact that the ordinance imposes additional requirements upon the property owners does not deprive them of any alleged property interest they may have acquired in the certificates of occupancy.

The judgment is affirmed.

In this opinion the other justices concurred.