# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 09-1681

HUSSEIN H. MANN and DEBRA HOUSTON-MANN,

*Plaintiffs-Appellants*,

*v.*

CALUMET CITY, ILLINOIS,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 555—**David H. Coar**, *Judge*.

No. 09-2481

ALONZO SMILEY, on behalf of himself and all others
similarly situated,

*Plaintiff-Appellant*,

*v.*

CALUMET CITY, ILLINOIS,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 3017—**Wayne R. Andersen**, *Judge*.

SUBMITTED OCTOBER 2, 2009—DECIDED DECEMBER 7, 2009

Before BAUER, POSNER, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*.    These consolidated appeals bring before us for the second time challenges to the constitutionality of an ordinance of Calumet City, Illinois, that forbids the sale of a house without an inspection to determine whether it is in compliance with the City's building code. Calumet City Code § 14-1. The previous appeal was from a judgment in favor of real estate brokers who had challenged the ordinance. We ordered the case dismissed because the brokers lacked standing to challenge the ordinance. *MainStreet Organization of Realtors v. Calumet City*, 505 F.3d 742 (7th Cir. 2007). If anyone's constitutional rights were infringed, they were the rights of a homeowner who wanted to sell his house without inspection, and the brokers did not have standing to litigate rights belonging to their clients. The panel majority based this conclusion on the "prudential" doctrine of standing rather than on Article III of the Constitution; Judge Sykes, in a concurring opinion, expressed the view that the brokers also lacked Article III standing. 505 F.3d at 749.

The standing problem is solved in the cases before us, which are brought by and on behalf of residents of Calumet City who were prevented from or delayed in selling their houses by the ordinance. The district judges dismissed the suits for failure to state a claim.

Both suits challenge the constitutionality of the ordinance "on its face," a phrase of uncertain meaning, as we pointed out in *A Woman's Choice-East Side Women's Clinic v. Newman*, 305 F.3d 684, 687 (7th Cir. 2002). What the plaintiffs seem to mean by it is that "no set of circumstances exists under which the [ordinance] would be valid," which is the definition in *United States v. Salerno*, 481 U.S. 739, 745 (1987); see also *United States v. Nagel*, 559 F.3d 756, 764-65 (7th Cir. 2009); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1077-78 (D.C. Cir. 2003). The Supreme Court is not sure about the definition, however, *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1190 (2008). Nor are we, as we indicated in *Woman's Choice*.

One way to think of condemning a statute "on its face" is as an exception to the principle that a statute should if possible be interpreted in such a way as to avoid its being held unconstitutional. See, e.g., *Rancho Viejo, LLC v. Norton*, *supra*, 323 F.3d at 1077-78. Sometimes courts refuse to adopt a narrowing interpretation, or to sever an objectionable provision and allow the rest to stand, and so strike down the entire statute even if applying just part of it to the particular facts of the case would not have raised a serious constitutional question.

In some cases statutes are invalidated as unconstitutional on their face because of a supposed *in terrorem* effect; that is the doctrine of *Thornhill v. Alabama*, 310 U.S. 88, 97 (1940); see *Church of the American Knights of the Ku Klux Klan v. City of Gary*, 334 F.3d 676, 683 (7th Cir.

2003), which permits a person to challenge a statute limiting free speech even though his particular speech, though not that of others within the scope of the statute, could constitutionally be suppressed. And finally it is always an option for a plaintiff to challenge a statute without dwelling on particulars of his case that might invalidate the application of the statute to him. That is the course that the plaintiffs in these cases have chosen. They don't argue that the City unreasonably delayed the sale of their property or unreasonably prevented the sale; they argue that even punctilious compliance with the procedural safeguards created by the ordinance cannot protect their constitutional rights. They are challenging the ordinance as written.

They have an uphill fight. "Point of sale" ordinances such as this one are common and have withstood constitutional attack in all cases that we know of in which the ordinance avoided invalidation under the Fourth Amendment by requiring that the city's inspectors obtain a warrant to inspect a house over the owner's objection. *Joy Management Co. v. City of Detroit*, 455 N.W.2d 55, 57-58 (Mich. App. 1990); *Butcher v. City of Detroit*, 347 N.W.2d 702, 707-08 (Mich. App. 1984); *Hometown Co-operative Apartments v. City of Hometown*, 515 F. Supp. 502, 504 (N.D. Ill. 1981); *Currier v. City of Pasadena*, 121 Cal. Rptr. 913, 917-18 (App. 1975); cf. *Greater New Haven Property Owners Ass'n v. City of New Haven*, 951 A.2d 551, 562-66 (Conn. 2008); *Tobin v. City of Peoria*, 939 F. Supp. 628, 633 (C.D. Ill. 1996); *Dome Realty, Inc. v. City of Paterson*, 416 A.2d 334, 349-50 (N.J. 1980). That means all cases other than *Wilson v. City of Cincinnati*, 346 N.E.2d 666, 671 (Ohio 1976), and *Home-*

*town Co-operative Apartments v. City of Hometown*, 495 F. Supp. 55, 60 (N.D. Ill. 1980). Calumet City's ordinance contains such a requirement.

The plaintiffs appeal mainly to the due process clause of the Fourteenth Amendment, which so far as bears on their case forbids a state or local government to deprive a person of property without due process of law. No court thinks, however, that this means the state can't regulate property—can't for example enact building codes and zoning regulations even though such measures limit the property owner's right to do what he wants with his property. *Village of Euclid v. Amber Realty Co.*, 272 U.S. 365, 394-95 (1926), so held and has been followed in innumerable cases. See, e.g., *Town of Rhine v. Bizzell*, 751 N.W.2d 780, 793-96 (Wis. 2008); *Napleton v. Village of Hinsdale*, 891 N.E.2d 839, 853 (Ill. 2008); *General Auto Service Station v. City of Chicago*, 526 F.3d 991, 1000-01 (7th Cir. 2008); *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 465-66 (7th Cir. 1988); *Albery v. Reddig*, 718 F.2d 245, 250-51 (7th Cir. 1983); *Davet v. City of Cleveland*, 456 F.3d 549, 552-53 (6th Cir. 2006). The principle is illustrated by a notable recent decision upholding the validity of an ordinance that prohibited keeping more than three dogs on property in a residential district. *Luper v. City of Wasilla*, 215 P.3d 342, 348-49 (Alaska 2009); see also *Greater Chicago Combine & Center, Inc. v. Chicago*, 431 F.3d 1065, 1072 (7th Cir. 2005) (keeping pigeons in residential areas); *Hull v. Scruggs*, 2 So. 2d 543 (Miss. 1941) (property owner can kill trespassing dog that has irresistible urge to suck eggs).

What is true is that a regulation may so constrict the rights of a property owner as to be deemed a "regulatory taking," entitling the owner to compensation under the takings clause of the Fifth Amendment for the diminution of the market value of his property. *Hodel v. Irving*, 481 U.S. 704, 716-17 (1987); but cf. *Andrus v. Allard*, 444 U.S. 51, 64-68 (1979). And the Supreme Court has held that the takings clause is made applicable to state action by the Fourteenth Amendment, e.g., *Kelo v. City of New London*, 545 U.S. 469, 477-80 (2005). But our plaintiffs aren't proceeding under the takings clause. Their argument is that the restrictions that the ordinance places on their property rights are irrational and therefore deprive them of property without due process of law, entitling them to enjoin the ordinance rather than just insist on compensation. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536-37, 540-43 (2005); *Cavel International, Inc. v. Madigan*, 500 F.3d 551, 556 (7th Cir. 2007); *Greater Chicago Combine & Center, Inc. v. City of Chicago, supra*, 431 F.3d at 1071-72; *Guggenheim v. City of Goleta*, 582 F.3d 996, 1030-31 (9th Cir. 2009).

But building codes, to which the challenged ordinance is ancillary, cannot be thought irrational. They do increase the cost of property (as do other conventional regulations of property), but if reasonably well designed they also increase its value. Without them more buildings would catch fire, collapse, become unsightly, attract squatters, or cause environmental damage and by doing any of these things reduce the value of other buildings in the neighborhood. Assuring full compliance with building codes is difficult after a building is built, because most

violations are committed inside the building and thus out of sight until a violation results in damage visible from the outside. Hence the ordinance, another objective of which is to prevent the surreptitious conversion of single-family into multi-family residences (for example by the owner's constructing a second kitchen or additional bathrooms), in violation of zoning codes the constitutionality of which is not questioned.

All this seems eminently reasonable (as reasonable as conditioning the transfer of title to real estate on payment of any real estate taxes due on the property—another common restriction on the sale of property), and indeed the plaintiffs do not, except in passing, challenge the principle of point of sale ordinances. Their focus is on the procedural adequacy of the method by which Calumet City's ordinance is enforced. They say it fails to protect a homeowner from unreasonable limitations on his property rights; one of those rights is the right to sell the property. But they fail to indicate concretely what the ordinance would have to provide in order to pass a workable test of reasonableness. It provides the conventional procedural safeguards and if these are inadequate we don't know what adequacy requires.

The ordinance requires a property owner to notify the City government of a proposed sale of his property. The City has 28 days after receiving the notice to conduct a compliance inspection. During that period it must notify the owner of its intention to conduct the inspection. If he responds that he won't consent to an inspection, the City has 10 days within which to get a warrant from

a judge, limited to authorizing an inspection for compliance with the building code. The City's building code is a standard such code (not an invention of Calumet City) called the "2006 International Property Maintenance Code."

Within three business days after conducting the inspection (whether or not pursuant to a warrant) the City must notify the owner whether the house is in compliance with the building code and, if not, what repairs are required to bring it into compliance. (If the inspection discloses an unlawful conversion of the house to a multi-family dwelling, the order, instead of being a repair order, will order deconversion.) After the City is notified that the repairs have been made or deconversion effected, it has three business days within which to reinspect. An owner who is in a hurry to sell the house can do so before completing the ordered repairs or deconversion if his buyer posts a bond equal to the expected cost of bringing the house into compliance. The buyer then has 180 days to complete the repairs or deconversion; if he fails to do so, the City can ask a court to order him to do so.

The owner can appeal a repair or deconversion order to the City's Zoning Board of Appeals, where he is entitled to a full hearing. The appeal stays the City's order. An owner who loses in the board of appeals is entitled to judicial review in the Illinois state court system in the usual manner.

We cannot think of what more could reasonably be required to protect the homeowner's rights, including his Fourth Amendment rights, which the ordinance's

warrant provisions fully protect. *Currier v. City of Pasadena, supra*, 121 Cal. Rptr. at 917-18; *Hometown Co-operative Apartments v. City of Hometown, supra*, 515 F. Supp. at 504; cf. *Tobin v. City of Peoria, supra*, 939 F. Supp. at 631-33; see generally *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 538-40 (1967), overruled on other grounds, *Califano v. Sanders*, 430 U.S. 99 (1977). The plaintiffs' arguments are either frivolous, or pertinent only to a challenge to how the ordinance is applied in particular cases by the City or its board of zoning appeals or the state courts, and that as we know is not the nature of their challenge.

In the frivolousness category is the argument that the ordinance fails to provide for "pre-deprivation" procedure. The plaintiffs want the City to have to go to court, or perhaps conduct an administrative hearing of some sort, before it can order repairs or deconversion. But remember that the homeowner can challenge the order, and if he does it is stayed; that is pre-deprivation process. *McKesson Corp. v. Division of Alcoholic Beverages & Tobacco*, 496 U.S. 18, 36-37 (1990); *McKenzie v. City of Chicago*, 118 F.3d 552, 558 (7th Cir. 1997); *Marco Outdoor Advertising, Inc. v. Regional Transit Authority*, 489 F.3d 669, 673-74 (5th Cir. 2007). "All that is required is . . . notice and an opportunity to be heard before being *deprived* of a protected liberty or property interest." *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 120 (W.D.N.Y. 2009) (emphasis in original).

The plaintiffs' challenges to how the ordinance might be applied include claims that the City may order purely cosmetic changes to the property and that the

board of zoning appeals might not allow cross-examina-tion. Such challenges are premature until and unless a homeowner challenges the ordinance on the ground that it has been applied to him in a way, not foreordained by the text of the ordinance, that deprives him of property. Unwilling to complain about the specifics of the applica-tion of the order to their planned sales, the plaintiffs insist that the ordinance be so detailed as to anticipate and provide for every possible abuse or irregularity in enforcement. To satisfy them the ordinance would have to be a thousand pages long. The Constitution does not require such detail.

One issue remains to be discussed. The order that we reversed in *MainStreet* enjoined the enforcement of the ordinance but the City thumbed its nose at the order and continued enforcing the ordinance. The district judge ordered the City to reimburse the Manns (the plaintiffs in No. 09-1681) for expenses that they had incurred as a result of its enforcement, and the parties on appeal plausibly treat this as an order regarding a contempt of court, though the judge never said the City was in contempt of the injunction. After we ordered dismissal of suit by the realtors—in the course of which the contempt order had been entered—for lack of standing, the district judge presiding in the Manns' suit vacated the order and the Manns challenge that ruling.

If a court has colorable jurisdiction of a case, though later it is determined that actually it didn't have jurisdiction, an order of criminal contempt issued by the court before the absence of jurisdiction is determined is valid. *United*

*States v. Straub*, 508 F.3d 1003, 1009-10 (11th Cir. 2007); *United States v. Kerley*, 416 F.3d 176, 181 (2d Cir. 2005); *National Maritime Union v. Aquaslide 'N' Dive Corp.*, 737 F.2d 1395, 1399 (5th Cir. 1984); cf. *Willy v. Coastal Corp.*, 503 U.S. 131, 137 (1992). (A related proposition is that contempt of an order later held beyond the court's power to issue may nevertheless be punished. E.g., *United States v. United Mine Workers of America*, 330 U.S. 258, 293 (1947); *Retired Chicago Police Ass'n v. City of Chicago*, 76 F.3d 856, 870 (7th Cir. 1996); *United States v. Mourad*, 289 F.3d 174, 177-78 (1st Cir. 2002); 13D Charles A. Wright et al., *Federal Practice & Procedure* § 3537, pp. 14-25 (3d ed. 2008).)

The rule doesn't apply to an order of civil contempt, however, *United States Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76, 79-80 (1988); *Blocksom & Co. v. Marshall*, 582 F.2d 1122, 1124 (7th Cir. 1978); 13D Wright *et al.*, *supra*, § 3537, pp. 25-26, because such an order doesn't seek to punish and by doing so vindicate the court's authority to compel compliance with its orders. Its objective is merely to protect a litigant's rights, in this case the Manns' right to be compensated for the costs they incurred as a result of the enforcement against them of an ordinance that the judge thought unconstitutional. Now that it's been determined that the ordinance is constitutional and therefore that there has been no violation of the Manns' rights, they are not entitled to reimbursement for the costs the ordinance imposed on them. *Ferrell v. HUD*, 186 F.3d 805, 814 (7th Cir. 1999); *United States v. Straub*, *supra*, 508 F.3d at 1009; *United States v. Spectro Foods Corp.*, 544 F.2d

1175, 1182 (3d Cir. 1976); *Salvage Process Corp. v. Acme Tank Cleaning Process Corp.*, 86 F.2d 727, 727 (2d Cir. 1936) (per curiam). "A conviction for criminal contempt may indeed survive the reversal of the decree disobeyed; the punishment is to vindicate the court's authority which has been equally flouted whether or not the command was right. But the same cannot be true of civil contempts, which are only remedial. It is true that the reversal of the decree does not retroactively obliterate the past existence of the violation; yet on the other hand it does more than destroy the future sanction of the decree. It adjudges that it never should have passed; that the right which it affected to create was no right at all. To let the liability stand for past contumacy would be to give the plaintiff a remedy not for a right but for a wrong, which the law should not do." *Id.*

There are some other issues, but no need to discuss them. The judgments are

AFFIRMED.